# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DENIS J. CONLON, NICOLE TRAVIS, DIANE M. MATO, BRIAN J. SCHROEDER, PATRICK A. JACEK, PETER HANSELMANN, and ALEXANDER PASCALE, Individually, on Behalf of The Northern Trust Company Thrift-Incentive Plan, and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) | Case No. 1:21-cv-2940<br><br>Judge Charles R. Norgle |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THE NORTHERN TRUST COMPANY; THE NORTHERN TRUST COMPANY EMPLOYEE BENEFIT ADMINISTRATIVE COMMITTEE; KIMBERLY SOPPI; and DOES 1-30, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Plaintiffs Denis J. Conlon, Nicole Travis, Diane M. Mato, Brian J. Schroeder, Patrick A. Jacek, Peter Hanselmann, and Alexander Pascale ("Plaintiffs") on behalf of The Northern Trust Company Thrift-Incentive Plan (the "Plan"), and similarly situated participants and beneficiaries of the Plan, bring this action against Defendants, The Northern Trust Company ("Northern Trust" or the "Company"), The Northern Trust Company Employee Benefit Administrative Committee ("Benefit Committee"), and Kimberly Soppi (collectively, "Defendants") for breaches of fiduciary duties and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001 *et seq.* Based on personal knowledge and information obtained from investigation by their counsel in this matter, Plaintiffs allege as follows:

## **INTRODUCTION**

1.      Defendants, with authority over Plan investments, breached their fiduciary duties by failing to select and monitor the Plan's investment options with prudence and loyalty as required by ERISA. Specifically, throughout the relevant period of June 1, 2015 through the present ("Class Period"), Defendants failed to monitor properly the Plan's investments and remove or replace investments in the Plan that were unsuitable in light of the prevalent circumstances. Instead, in disregard of their fiduciary mandate under ERISA, Defendants loaded the Plan with deficient funds, and then kept these funds on the Plan's investment menu throughout the Class Period, despite not having an appropriate fiduciary process in place to oversee these retirement investments. In further breach of their fiduciary duties, Defendants failed to monitor properly the Plan's investment and administrative fees to ensure they were not unreasonable for the Plan. Defendants committed further statutory violations by engaging in conflicted transactions expressly prohibited by ERISA.

2.      To remedy Defendants' breaches of fiduciary duty and prohibited transactions, Plaintiffs individually, on behalf of the Plan and on behalf of similarly situated participants and beneficiaries of the Plan, bring this action under ERISA §§404, 406, 409, 502(a), 29 U.S.C. §§1104, 1106, 1109, 1132(a).  Plaintiffs seek recovery of Plan losses and disgorgement of unlawful fees and profits.[1] In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## PARTIES

3.      Denis J. Conlon is a participant, as defined in ERISA §3(7), 29 U.S.C. §1002(7), in the Plan.  Plaintiff Conlon suffered harm by investing in the Plan's deficient investment options, including the Northern Trust Focus 2020 Fund during the Class Period.

4.      Nicole Travis is a participant, as defined in ERISA §3(7), 29 U.S.C. §1002(7), in the Plan. Plaintiff Travis suffered harm by investing in the Plan's deficient investment options, including the Northern Trust Focus 2060 Fund during the Class Period.

5.      Diane M. Mato is a participant, as defined in ERISA §3(7), 29 U.S.C. §1002(7), in the Plan.  Plaintiff Mato suffered harm by investing in the Plan's deficient investment options, including the Northern Trust Focus 2035 Fund during the Class Period.

6.      Brian J. Schroeder is a participant, as defined in ERISA §3(7), 29 U.S.C. §1002(7), in the Plan.  Plaintiff Schroeder suffered harm by investing in the Plan's deficient investment options, including the Northern Trust Focus 2040 Fund during the Class Period.

---

[1]      Damage calculations provided in this Complaint generally begin on January 1, 2015 for estimation purposes.  Particular losses within the Class Period will be provided through expert discovery.

7.    Patrick A. Jacek is a participant, as defined in ERISA §3(7), 29 U.S.C. §1002(7), in the Plan.  Plaintiff Jacek suffered harm by investing in the Plan's deficient investment options, including the Northern Trust Focus 2050 Fund during the Class Period.

8.    Peter Hanselmann is a participant, as defined in ERISA §3(7), 29 U.S.C. §1002(7), in the Plan.  Plaintiff Hanselmann suffered harm by investing in the Plan's deficient investment options, including the Northern Trust Focus 2055 Fund during the Class Period.

9.    Alexander Pascale is a participant, as defined in ERISA §3(7), 29 U.S.C. §1002(7), in the Plan.  Plaintiff Pascale suffered harm by investing in the Plan's deficient investment options, including the Northern Trust Focus 2060 Fund during the Class Period.

10.    Defendant Northern Trust is an Illinois banking corporation with its principal place of business located in Chicago, Illinois.  Northern Trust is the sponsor of the Plan within the meaning of ERISA §3(16)(B), 29 U.S.C. §1002(16)(B). Northern Trust is also the Plan Trustee and fiduciary of the Plan.  During the Class Period, Northern Trust has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

11.    Defendant Benefit Committee is the named Plan Administrator and a Plan Fiduciary and is located in Chicago, Illinois. At all relevant times, Defendant Benefit Committee, through its members, has managed and administered the Plan and has had discretionary authority or control over the assets of the Plan.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

12.    Defendant Kimberly Soppi signed the Plan Form 5500 filings with the U.S. Department of Labor ("DOL") throughout the Class Period as the Plan Administrator.  Upon information and belief, Defendant Soppi is the Company's Vice President of Human Resources Benefits.  Additionally, upon information and belief, Defendant Soppi has served as a member of the

Benefits Committee during the Class Period. At all relevant times, Defendant Soppi has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets. ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

13.     Because Plaintiffs are currently unaware of the identities of the individual members of the Benefit Committee, other than Defendant Soppi, those individuals are collectively named as Defendant Does 1-30. Plaintiffs will substitute the real names of the Does when they become known to Plaintiffs. To the extent the Benefit Committee delegated any of its fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiffs, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. §1002(21)(A) and is also alleged to be a Doe Defendant.

## **JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction over this matter pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(a)(2) and (3), 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

15.     This Court has general personal jurisdiction over Defendant Northern Trust, which has its principal place of business in this District, and over any other Defendant that resides in this District. This Court has specific personal jurisdiction over all Defendants because they took the actions described herein in this District through the management of the Plan.

16.     Venue is proper in this District under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because Defendants reside in this District, Defendants conduct business in this District, and the harm complained of herein emanated from this District.

## ERISA'S FIDUCIARY STANDARDS

17.     ERISA §§404(a)(1)(A) and (B), 29 U.S.C. §§1104(a)(1)(A) and (B), provide, in pertinent part, that fiduciaries shall discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

18.     These fiduciary duties under ERISA §§404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence.

19.     "[T]he duties charged to an ERISA fiduciary are 'the highest known to the law.'" *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011).  ERISA fiduciaries must "act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act." *Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012), *aff'd* 829 F.3d 803 (7th Cir. 2016).

20.     As part of their fiduciary duties here, Defendants have "a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 523 (2015).  "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.*  If an investment is imprudent, Defendants "'must dispose of it within a reasonable time.'" *Id.* (citation omitted).  Accordingly, fiduciaries must vigorously and independently investigate each of the Plan's investment options with the skill of a prudent investor.

21.     In addition to the general duty of loyalty, ERISA fiduciaries also are barred from engaging in conflicted transactions or those with parties in interest.  ERISA §406. "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if [it] knows or should know that such transaction constitutes a direct or indirect . . . sale or exchange, or leasing, of any property[,]. . . furnishing of . . . services . . . between the plan and a party interest" or "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]"  ERISA §406(a)(1).  A "party in interest" can include "any fiduciary[,]. . . a person providing services to such plan[, or] an employer any of whose employees are covered by such plan[.]"  ERISA §402(14).  "A fiduciary with respect to a plan shall not . . . deal with the assets of the plan in [its] own interest or for [its] own account" or "receive any consideration for [its] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  ERISA §406(b).

22.     ERISA §405 renders Plan fiduciaries liable for the breaches of other fiduciaries under certain circumstances, such as when a fiduciary knowingly participates in or conceals the breach of another fiduciary, if the fiduciary's own breach enables the breach by the other fiduciary, or if the fiduciary is aware of the other fiduciary's breach yet makes no reasonable effort to correct the breach.

## THE PLAN

23.     The Plan is an employee benefit plan within the meaning of ERISA §§3(3) and 3(2)(A), 29 U.S.C. §§1002(3) and 1002(2)(A), and a "defined contribution" plan within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

24.     Defendant Northern Trust is the sponsor of the Plan, and Defendant Benefit Committee is the Plan Administrator.  Both Defendants are also Plan fiduciaries.

25.     The Plan enables Northern Trust employees, former employees, and their beneficiaries (the "Plan participants") to save for their retirement.  The Plan provides for individual accounts for each Plan participant and for benefits based solely upon the amount contributed to the participant's account.

26.     Defendants exclusively control the selection and retention of the Plan's investment options. Plan participants can invest their retirement savings only in those funds that Defendants have selected for the Plan's investment line-up.

27.     With over $2.7 billion in assets under management, and over 12,000 participants, the Plan is one of the largest defined contribution plans in the nation, or a so-called "jumbo plan," with tremendous leverage to obtain superior investment products and services.

### DEFENDANTS VIOLATED THEIR FIDUCIARY DUTIES BY FAILING TO ESTABLISH AND FOLLOW A PRUDENT AND LOYAL PROCESS FOR MONITORING PLAN FUNDS

28.     As Plan fiduciaries, Defendants were responsible for selecting and then monitoring the Plan's investment options.  Defendants failed to perform this function prudently and loyally. Instead, in derogation of their ERISA mandated duties, Defendants failed to consider the continued prudence of maintaining the funds challenged here, including a number of Northern Trust's proprietary funds, even as these funds underperformed their benchmarks and/or generated unreasonable fees, resulting in Plan losses and/or unjust profits for the Company.  Defendants' failure to monitor the continued prudence of the challenged Plan funds is all the more egregious in light of the availability of other investment alternatives (including non-affiliated options), with the same investment objectives that were less risky, less costly, and able to present a consistently superior performance record at all relevant times.  There were even less costly shares available of certain funds at issue that other plan investors were able to invest in, but not the participants of the instant Plan.  Moreover, as a result of the Plan being invested in the challenged funds, Plan

participants have also been subjected to the added burden of redemption fees, commissions, and other similar expenses in connection with these investments throughout the Class Period.

**A. Defendants Maintained the Plan's Investment in Deficient Proprietary Target Date Funds, When Other Investment Vendors Offered Superior Options**

**1. The Plan's Target Date Fund Options**

29. The Plan offers a suite of so-called target date funds or "TDFs" to retirement investors who work for Northern Trust, including Plaintiffs. These funds are designed to provide a model asset allocation based on a given investor's projected retirement date, *i.e.*, the target date, and generally rebalance their portfolios to become more conservative as the investor nears retirement. Target date funds are an eligible qualified default investment alternative ("QDIA") under the Pension Protection Act of 2006.

30. Here, the Plan's TDF strategy consists of the Northern Trust's proprietary target date fund series called the Northern Trust Focus Target Retirement Trusts ("Northern Trust Focus Funds" or the "Funds"),[2] with the Funds' respective target retirement dates ranging from 2010 to 2060. Since 2013, when they were initially offered to Plan participants, the Funds have been the only target date retirement investing options in the Plan. As such, participants in the Plan who want to invest in a tax-advantaged target date fund strategy have no choices other than the Northern Trust Focus Funds.

---

[2] These funds are organized as a collective investment trust (as opposed to a registered investment company or mutual fund). Collective investment trusts are subject to either state or federal banking regulations but are exempt from regulation by the Securities and Exchange Commission and the securities regulations of any state or other jurisdiction. Accordingly, public information is not as readily available for collective investment trusts as it would be for mutual funds. For information to support the allegations in the Complaint, Plaintiffs have relied primarily on Department of Labor filings and data published by Morningstar.

31. The Northern Trust Focus Funds are also designated here as the Plan's QDIA. That is, if participants do not make investment fund elections, the Plan automatically invests their contributions, along with any matching contributions and/or earnings, in one of the Northern Trust Focus Funds based on their age.

32. As of December 31, 2020, the Plan included the following Northern Trust Focus Funds along with the amount of Plan assets invested in each Fund:[3]

| Plan Option | 2020 Value | 2015 Value |
| --- | --- | --- |
| Northern Trust Focus 2010 Fund | $3,677,201 | $3,083,654 |
| Northern Trust Focus 2015 Fund | $7,890,871 | $15,427,970 |
| Northern Trust Focus 2020 Fund | $3,979,328 | $34,370,088 |
| Northern Trust Focus 2025 Fund | $53,505,574 | $38,469,493 |
| Northern Trust Focus 2030 Fund | $75,561,796 | $30,293,251 |
| Northern Trust Focus 2035 Fund | $60,637,001 | $32,461,852 |
| Northern Trust Focus 2040 Fund | $46,656,990 | $20,803,257 |
| Northern Trust Focus 2045 Fund | $42,006,076 | $16,391,107 |
| Northern Trust Focus 2050 Fund | $32,805,571 | $9,714,928 |
| Northern Trust Focus 2055 Fund | $17,861,027 | $3,398,332 |
| Northern Trust Focus 2060 Fund | $7,754,280 | $466,243 |

**2. Defendants Failed to Adhere to a Prudent Fiduciary Process with Regard to the Plan's TDFs**

33. The use of target date funds as 401(k) investment options by defined contribution plans, such as the Plan, has grown exponentially over the last decade, in large part due to the automatic enrollment of newly eligible plan participants in these funds. By the end of 2020, "95% of plans

---

[3]      To estimate damages, the values listed here are the reported assets as of the end of December 31, 2019, as disclosed in Form 5500 filed with the Department of Labor on August 31, 2020. The 2015 values are used in later sections to illustrate the economic losses to Plan participants. However, these values do not account for fresh inflows into the funds from new employees, which likely occurred because the majority of the Northern Trust Focus Funds have multiples of more assets in 2020 compared to 2015. Thus, the real damages for members of the Class, when including new employees who invested in these funds after 2015, are likely far higher.

offered a TDF, 80% of all participants had a position in one, and the funds accounted for 37% of plans' assets and 60% of total plan contributions."[4]

34. Because of the prevalent use of target date funds by retirement plans, the TDF market is highly competitive and lucrative, with many target date fund providers vying to procure such business, especially with regard to jumbo plans like the Plan. According to Vanguard, one of the industry's leaders, "[i]n the past 10 years through 2020, assets [held by TDFs] grew from $290 billion to $2.6 trillion as TDFs gained significant traction as a [QDIA]."[5] As such, retirement plan fiduciaries have numerous target date funds to choose from when selecting target date fund options for the plans under their watch.

35. Given the popularity of target date funds with 401(k) plan participants (especially as here, where these funds are offered as the Plan's default investments), and further given the broad array of TDFs available in the marketplace, having a prudent and unconflicted process in place for monitoring a retirement plan's TDF strategy is of utmost importance while serving as a 401(k) plan fiduciary.

36. As Vanguard advises employers with regard to defined contribution plan investing, "[w]ith TDFs playing such an important role in employees' retirement, selecting the right one is one of the most important decisions you can make for your lineup."[6] Such a process entails (among other

---

[4]   *Target-date fund adoption in 2020*, Vanguard Research Note (March 2021), https://institutional.vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvR esTDFAdoption2020.

[5]   Colleen M. Jaconetti, Kimberly A. Stockton, Christos Tasopoulos, and Vivien Chen, *TDF strategies for retirement income*, The Vanguard Group (September 2021), https://institutional. vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvComLineUpRetireGo als.

[6]   *Defined contribution investing*, https://institutional.vanguard.com/solutions/dcinvesting/ investmentstrategies.

things) periodic target date fund reviews that include consideration of alternative TDF strategies to ensure the TDF solutions offered through the plan remain prudent. In instances, where as here, a target date fund strategy is designated as a retirement plan's default investment, comprehensive QDIA due diligence is especially important to ensure the prudence of that investment for the plan at issue.[7]

37. Yet here no such prudent process was followed by Defendants in spite of their fiduciary status under ERISA. Despite the Plan's jumbo size, which should have enabled Defendants to obtain superior target date funds to offer to Plan participants (in terms of both performance and price), and despite a market flush with such better-performing alternatives available to the Plan at the same or lesser cost, Defendants kept the Plan invested in the Northern Trust Focus Funds throughout the Class Period. All the while these Funds failed to meet their benchmark indices and underperformed comparable target date funds offered by competing fund families.

38. Indeed, for over a decade (since Northern Trust launched them in 2010), the Northern Trust Focus Funds have performed worse than 70% to 90% of peer funds, yet the Defendants persistently failed to conduct appropriate due diligence concerning their inclusion in the Plan, including failing to consider properly the available alternative investments. And Defendants likewise took no measures to protect the Plan participants from losses stemming from the Plan's investment in these Funds.

39. Before deciding to offer the Northern Trust Focus Funds to the Plan's participants, any reasonable and prudent ERISA fiduciary adhering to a rigorous investment selection process

---

[7] By way of example, Vanguard advises its potential institutional clients that "[y]ou also have a duty as a fiduciary to establish a regular due diligence process to protect your plan participants," and offers its institutional investment advisory services to, *inter alia*, "help [companies] make sense of defined contribution investment concerns such as suitability of custom portfolios and detailed QDIA due diligence," https://institutional.vanguard.com/solutions/dcadvisory-services (last visited Oct. 22, 2021).

would have compared the Funds' performance with the performance of established target date benchmarks, such as the Dow Jones US Target Date ("DJ US TD") Index and S&P Target Date ("S&P TD") Index. By 2013, when Defendants first put their Funds in the Plan, the Funds already had a track record of poor performance compared to these indices. In fact, since Northern Trust created the Funds in 2010, they have underperformed relative to both benchmarks.

40.     The Northern Trust Focus Funds also have a record of underperformance relative to comparable target date funds. To measure each fund's investment performance relative to its peers, Morningstar places each of the Northern Trust Focus Funds into a specific target date Morningstar Category[8] that includes hundreds of other funds pursuing the same target retirement date investment strategy. Morningstar classifies the target date funds offered by American Funds, T. Rowe Price, and Vanguard (collectively, the "Comparator Funds") within the same Category as the Northern Trust Focus Funds. Each investment adviser for the Comparators Funds is an industry leader capable of providing target date strategies to large 401(k) plans like the Plan here. The Comparator Funds outperformed the Northern Trust Focus Funds between 2010 and 2013. Still, Defendants selected Northern Trust Focus Funds for the Plan instead of any the Comparator Funds.

41.     Defendants' decision to select the Northern Trust Focus Funds as the Plan's target date strategy resulted, collectively speaking, in a swift and devastating blow to Plaintiffs' and other Plan participants' retirement accounts. In 2013-2014, the first two years that the Plan offered the Northern Trust Focus Funds, those Funds underperformed relative to the Comparator Funds. And

---

[8]     A Morningstar Category is assigned by placing funds (*e.g.*, Northern Trust, Fidelity, T. Rowe Price, and Vanguard) into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in Morningstar's analysis and proprietary classification methodology. Funds are placed in a category based on their portfolio statistics and compositions over the past three years.

the Northern Trust Focus Funds continued underperforming throughout the Class Period. Since their inception in 2010, the Northern Trust Focus Funds have experienced over a decade of continuous underperformance.

42.     Still, Defendants have failed to remove the Northern Trust Focus Funds from the Plan. During the proposed Class Period here, Defendants even added the Northern Trust 2060 Fund to the Plan's investment offerings. A reasonable investigation by Defendants would have revealed the Focus Funds' chronic underperformance and prompted Defendants to remove and replace them with superior options.

43.     To this day, the investment performance of each of the 11 Northern Trust Focus Funds has continued its downward spiral to the bottom of their respective Morningstar Categories for the preceding three-year and five-year periods. Most of the Northern Trust Focus Funds have performed worse than between 70% and 95% of the hundreds of funds within their respective Morningstar Categories for the past three-year and five-year periods. The Northern Trust Focus Funds have also continued underperforming the DJ US TD Index and S&P TD Index. The overall breadth and depth of the Northern Trust Focus Funds' underperformance raises a plausible inference that Defendants' fund selection and monitoring process for the Plan was tainted by a failure of competency or effort.

44.     In the tables below, Plaintiffs demonstrate the underperformance of the 11 Northern Trust Focus Funds compared to the S&P TD Index, the DJ US TD Index, and the Comparator Funds at various periods since 2010. The data presented below was available to Defendants throughout the proposed Class Period in real-time.

45.     The Comparator Funds listed in the tables below (T. Rowe Price and Vanguard) pursue the same investment objectives as the Northern Trust Focus Funds, are managed by well-known investment advisers, and are available to all large retirement plans, such as the Plan.

### 3.     Northern Trust Focus 2010 Fund

46.     The Northern Trust (NT) Focus 2010 Fund's underperformance dates back to its inception. **Table 1.a** below, illustrates nearly four years of underperformance leading up to the Class Period, and Northern Trust removed better performing Vanguard Target Retirement Funds and replaced them with Northern Trust Focus Funds during the 2013 plan year, relative to benchmark indexes and Comparator Funds.

### Table 1.a

#### 2010-2013

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2010 | 34.99% | 7.96% |
| Vanguard 2010 | 40.03% | 8.98% |
| T Rowe Price 2010 | 45.25% | 10.00% |
| American Funds 2010 | 43.30% | 9.62% |
| S&P 2010 TD BM | 37.22% | 8.41% |
| DJ US 2010 TD BM | 33.93% | 7.74% |

47.     A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table 1.a** above as benchmarks for the performance of the Northern Trust Focus 2010 Fund. Morningstar also places the Northern Trust Focus 2010 Fund in its Target Date 2000-2010 Morningstar Category along with the Comparator Funds managed by American Funds, T. Rowe Price, and Vanguard.[9]

---

[9]     Although Vanguard offered the Vanguard Target Retirement 2010 Trust as a collective investment trust to 401(k) plans, Vanguard discontinued its target date 2010 strategy in 2017, as its asset allocation became substantially identical to the Target Retirement Income Fund. Plaintiffs could not access Morningstar archived performance data for the Vanguard Target Retirement 2010 Trust.

48.     Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2010 Fund from the Plan.  Predictably, the underperformance continued throughout the Class Period.

49.     **Table 1.b** below illustrates the underperformance of the Northern Trust Focus 2010 Fund from 2015 through 2020 on an annualized basis.   Furthermore, the differences in annual performance are even more pronounced when compounded over time.   Thus, as the table demonstrates, the Northern Trust Focus 2010 Fund also significantly underperformed the benchmark indexes and Comparator Funds[10] on a cumulative basis.

**Table 1.b**

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performace |
|---|---|---|---|---|---|---|---|---|
| NT Focus 2010 | -0.49% | 5.26% | 9.24% | -3.01% | 14.36% | 11.29% | 41.24% | |
| Vanguard 2010 | -0.21% | 5.21% | 8.48% | -1.99% | 13.15% | 10.18% | 39.17% | 2.08% |
| T Rowe Price 2010 | -0.77% | 7.11% | 11.67% | -3.61% | 16.14% | 11.90% | 48.68% | -7.44% |
| American Funds 2010 | -0.84% | 7.44% | 10.33% | -2.52% | 13.91% | 9.25% | 42.60% | -1.36% |
| S&P 2010 TD BM | -0.20% | 5.82% | 9.96% | -3.10% | 14.30% | 18.40% | 52.31% | -11.06% |
| DJ US 2010 TD BM | 0.36% | 4.05% | 5.75% | -0.63% | 11.05% | 8.07% | 31.69% | 9.55% |

50.     Put in a broader context, according to Morningstar, the 2010 Fund's performance has been worse than 81% of funds in Target Date 2010 Morningstar Category for the past three-year and five-year periods.  In those periods, there have been between 76 and 95 funds in that Morningstar Category.

51.     At the beginning of 2015, the assets of the Northern Trust Focus 2010 Fund totaled approximately $4.1 million.  **Table 1.c** below shows the hypothetical growth of $4.1 million invested in the Northern Trust Focus 2010 Fund and each of the Comparator Funds from January 1, 2015 through December 31, 2020.  As the table makes clear, Defendants' failure to replace the

---

10      Data unavailable.  *See supra* n.9.

Northern Trust Focus 2010 Fund with one of these Comparator Funds in 2015 resulted in the Plan losing upwards of $310,000 in retirement savings.

**Table 1.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $4,176,872.00 |
|---|---|---|---|---|
| Northern Trust Focus 2010 Fund W | 41.24% | 5.92% | $ | 5,899,561.08 |
| | | | | |
| Vanguard Target Retirement 2010 | 39.17% | 5.66% | $ | 5,812,768.89 |
| +/- Northern Trust | 2.08% | 0.26% | $ | 86,792.19 |
| | | | | |
| T. Rowe Price Target 2010 | 48.68% | 6.83% | $ | 6,210,233.66 |
| +/- Northern Trust | -7.44% | -0.91% | $ | (310,672.58) |
| | | | | |
| American Fund 2010 | 42.60% | 6.09% | $ | 5,956,212.39 |
| +/- Northern Trust | -1.36% | -0.17% | $ | (56,651.31) |

### 4. Northern Trust Focus 2015 Fund:

52. The Northern Trust Focus 2015 Fund's underperformance dates back to its inception. **Table 2.a** below, illustrates nearly four years of underperformance leading up to the Class Period, relative to benchmark indexes and Comparator Funds.

**Table 2.a**

<u>2010-2013</u>

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2015 | 38.54% | 8.68% |
| Vanguard 2015 | 46.41% | 10.22% |
| T Rowe Price 2015 | 52.25% | 11.33% |
| American Funds 2015 | 48.12% | 10.55% |
| S&P 2015 TD BM | 43.29% | 9.62% |
| DJ US 2015 TD BM | 40.87% | 9.14% |

53. A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table 2.a** above as benchmarks for the performance of the Northern Trust Focus 2015 Fund. Morningstar also places the Northern Trust Focus 2015 Fund in its Target Date 2015 Morningstar Category along with the Comparator Funds managed by American Funds, T. Rowe Price, and Vanguard.

16

54.     Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2015 Fund from the Plan.  Predictably, the underperformance continued throughout the Class Period.

55.     **Table 2.b** below illustrates the underperformance of the Northern Trust Focus 2015 Fund from January 1, 2015 through December 31, 2020 on an annualized basis.  Furthermore, the differences in annual performance are even more pronounced when compounded over time.  Thus, as the table demonstrates, the Northern Trust Focus 2015 Fund also significantly underperformed the benchmark indexes and Comparator Funds on a cumulative basis.

### Table 2.b

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performance |
|------|------|------|------|------|------|------|-----------------------|------------------------------|
| NT Focus 2015 | -0.87% | 5.46% | 9.74% | -3.21% | 14.58% | 11.62% | 42.02% | |
| Vanguard 2015 | -0.46% | 6.17% | 11.51% | -2.98% | 14.80% | 10.42% | 44.93% | -2.91% |
| T Rowe Price 2015 | -0.57% | 7.33% | 13.33% | -4.17% | 17.40% | 12.57% | 53.18% | -11.17% |
| American Funds 2015 | -0.61% | 7.55% | 11.26% | -2.71% | 14.83% | 9.96% | 46.10% | -4.08% |
| S&P 2015 TD BM | -0.17% | 6.55% | 11.40% | -3.66% | 15.39% | 18.40% | 55.95% | -13.93% |
| DJ US 2015 TD BM | 0.28% | 5.19% | 6.87% | -1.12% | 12.10% | 8.30% | 35.35% | 6.67% |

56.     Put in a broader context, according to Morningstar, the Northern Trust Focus 2015 Fund performed worse than 87% and 77% of all funds in the Target Date 2015 Morningstar Category for the preceding three-year and five-year periods, respectively.  In those periods, there have been between 74 and 101 funds in the Target Date 2015 Morningstar Category.

57.     At the beginning of the Class Period in 2015, the assets of the Plan that were invested in the Northern Trust Focus 2015 Fund totaled approximately $21.1 million.  **Table 2.c** below shows the hypothetical growth of $21.1 million invested in the Northern Trust Focus 2015 Fund and each of the Comparator Funds from January 1, 2015 through December 31, 2020.  As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2015 Fund with one of these Comparator Funds in 2015 resulted in the Plan losing upwards of $2.3 million in retirement savings.

**Table 2.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $21,143,010.00 |
|---|---|---|---|---|
| Northern Trust Focus 2015 Fund W | 42.02% | 6.02% | $ | 30,026,406.11 |
| | | | | |
| Vanguard Target Retirement 2015 | 44.93% | 6.38% | $ | 30,641,641.72 |
| +/- Northern Trust | -2.91% | -0.36% | $ | (615,235.61) |
| | | | | |
| T. Rowe Price Target 2015 | 53.18% | 7.37% | $ | 32,387,320.35 |
| +/- Northern Trust | -11.17% | -1.35% | $ | (2,360,914.24) |
| | | | | |
| American Fund 2015 | 46.10% | 6.52% | $ | 30,889,350.46 |
| +/- Northern Trust | -4.08% | -0.50% | $ | (862,944.35) |

### 5.    Northern Trust Focus 2020 Fund:

58.    The Northern Trust Focus 2020 Fund's underperformance dates back to its inception. **Table 3.a** below, illustrates nearly four-years of underperformance leading up to the Class Period, relative to benchmark indexes and Comparator Funds.

**Table 3.a**

2010-2013

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2020 | 42.28% | 9.42% |
| Vanguard 2020 | 51.28% | 11.15% |
| T Rowe Price 2020 | 58.26% | 12.44% |
| American Funds 2020 | 54.42% | 11.73% |
| S&P 2020 TD BM | 48.94% | 10.71% |
| DJ US 2020 TD BM | 49.78% | 10.87% |

59.    A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table 3.a** above as benchmarks for the performance of the Northern Trust Focus 2020 Fund.  Again, one of Northern Trust's largest client retirement plans uses the S&P Target Date 2020 as the benchmark index for the Northern Trust Focus 2020 Fund.  Morningstar also places the Northern Trust Focus 2020 Fund in its Target Date 2020 Morningstar Category along with the Comparator Funds managed by American Funds, T. Rowe Price, and Vanguard.

18

60.     Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2020 Fund from the Plan.  Predictably, the Fund continued underperforming throughout the Class Period.

61.     **Table 3.b** below illustrates the underperformance of the Northern Trust Focus 2020 Fund from January 1, 2015 through December 31, 2020 on an annualized basis.  Furthermore, the differences in annual performance are even more pronounced when compounded over time.  Thus, as the table demonstrates, the Northern Trust Focus 2020 Fund significantly underperformed the benchmark indexes and Comparator Funds on a cumulative basis.

**Table 3.b**

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performance |
|---|---|---|---|---|---|---|---|---|
| NT Focus 2020 | -1.27% | 5.76% | 10.71% | -3.64% | 15.05% | 11.76% | 43.23% | |
| Vanguard 2020 | -0.68% | 6.94% | 14.08% | -4.24% | 17.63% | 12.09% | 53.00% | -9.77% |
| T Rowe Price 2020 | -0.31% | 7.40% | 15.74% | -4.93% | 19.38% | 13.19% | 59.18% | -15.96% |
| American Funds 2020 | 0.17% | 7.06% | 12.82% | -2.69% | 15.62% | 10.99% | 51.09% | -7.86% |
| S&P 2020 TD BM | -0.21% | 7.20% | 12.77% | -4.16% | 16.51% | 18.40% | 59.49% | -16.26% |
| DJ US 2020 TD BM | 0.27% | 6.29% | 8.46% | -1.43% | 13.87% | 8.63% | 40.95% | 2.28% |

62.     Put in a broader context, according to Morningstar, the Northern Trust Focus 2020 Fund performed worse than 82% and 81% of all funds in the Target Date 2020 Morningstar Category over the preceding three-year and five-year periods, respectively.  In those periods, there have been between 109 and 152 funds in the Target Date 2020 Morningstar Category.

63.     At the beginning of 2015, the assets of the Northern Trust Focus 2020 Fund totaled approximately $36.6 million.  **Table 3.c** below shows the hypothetical growth of $36.6 million invested in the Northern Trust Focus 2020 Fund and each of the Comparator Funds from January 1, 2015 through December 31, 2020.  As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2020 Fund with one of these Comparator Funds in 2015 resulted in the Plan losing upwards of $5.8 million in retirement savings.

19

**Table 3.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $36,674,368.00 |
|---|---|---|---|---|
| Northern Trust Focus 2020 Fund W | 43.23% | 5.68% | $ | 52,527,670.09 |
| | | | | |
| Vanguard Target Retirement 2020 | 53.00% | 7.34% | $ | 56,110,548.10 |
| +/- Northern Trust | -9.77% | -1.66% | $ | (3,582,878.00) |
| | | | | |
| T. Rowe Price Target 2020 | 59.18% | 8.06% | $ | 58,379,221.28 |
| +/- Northern Trust | -15.96% | -2.37% | $ | (5,851,551.19) |
| | | | | |
| American Fund 2020 | 51.09% | 7.12% | $ | 55,409,881.57 |
| +/- Northern Trust | -7.86% | -1.44% | $ | (2,882,211.48) |

### 6. Northern Trust Focus 2025 Fund:

64. The Northern Trust Focus 2025 Fund's underperformance dates back to its inception. **Table 4.a** below illustrates nearly four years of underperformance leading up to the Class Period, relative to benchmark indexes and Comparator Funds.

**Table 4.a**

2010-2013

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2025 | 45.88% | 10.12% |
| Vanguard 2025 | 55.65% | 11.96% |
| T Rowe Price 2025 | 63.35% | 13.35% |
| American Funds 2025 | 64.71% | 13.59% |
| S&P 2025 TD BM | 53.69% | 11.60% |
| DJ US 2025 TD BM | 59.62% | 12.68% |

65. A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table 4.a** above as benchmarks for the performance of the Northern Trust Focus 2025 Fund. Again, one of Northern Trust's largest client retirement plans uses the S&P Target Date 2025 as the benchmark index for the Northern Trust Focus 2025 Fund. Morningstar also places the Northern Trust Focus 2025 Fund in its Target Date 2025 Morningstar Category along with the Comparator Funds managed by American Funds, T. Rowe Price, and Vanguard.

66. Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2025 Fund from the Plan. Predictably, the underperformance continued throughout the Class Period.

67. **Table 4.b** below illustrates the underperformance of the Northern Trust Focus 2025 Fund from January 1, 2015 through December 31, 2020 on an annualized basis. Furthermore, the differences in annual performance are even more pronounced when compounded over time. Thus, as the table demonstrates, the Northern Trust Focus 2025 Fund also significantly underperformed the benchmark indexes and Comparator Funds on a cumulative basis.

### Table 4.b

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performace |
|------|------|------|------|------|------|------|-----------------------|-----------------------------|
| NT Focus 2025 | -1.66% | 6.31% | 12.42% | -4.35% | 16.85% | 12.64% | 47.96% | |
| Vanguard 2025 | -0.85% | 7.49% | 15.95% | -5.16% | 19.64% | 13.34% | 58.90% | -10.94% |
| T Rowe Price 2025 | -0.16% | 7.53% | 17.67% | -5.60% | 20.94% | 14.69% | 65.39% | -17.43% |
| American Funds 2025 | 0.13% | 7.36% | 15.27% | -3.41% | 17.75% | 13.67% | 60.20% | -12.24% |
| S&P 2025 TD BM | -0.23% | 7.81% | 14.56% | -5.03% | 18.40% | 18.40% | 64.05% | -16.09% |
| DJ US 2025 TD BM | 0.18% | 7.77% | 10.56% | -2.30% | 16.37% | 9.62% | 48.75% | -0.79% |

68. Put in a broader context, according to Morningstar, Northern Trust Focus 2025 Fund performed worse than 85% and 91% of funds in the Target Date 2025 Morningstar Category in the preceding three-year and five-year periods, respectively. During those periods, there have been between 151 and 191 funds in the Target Date 2025 Morningstar Category.

69. At the start of 2015, the assets of the Northern Trust Focus 2025 Fund totaled approximately $38.8 million. **Table 4.c** below shows the hypothetical growth of $38.8 million invested in the Northern Trust Focus 2025 Fund and each of the Comparator Funds from January 1, 2015 through December 31, 2020. As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2025 Fund with one of the Comparator Funds in 2015 resulted in the Plan losing upwards of $6.7 million in retirement savings.

**Table 4.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $38,838,816.00 |
|---|---|---|---|---|
| Northern Trust Focus 2025 Fund W | 47.96% | 6.75% | $ | 57,467,223.90 |
| | | | | |
| Vanguard Target Retirement 2025 | 58.90% | 8.02% | $ | 61,715,734.69 |
| +/- Northern Trust | -10.94% | -1.28% | $ | (4,248,510.79) |
| | | | | |
| T. Rowe Price Target 2025 | 65.39% | 8.75% | $ | 64,236,753.13 |
| +/- Northern Trust | -17.43% | -2.00% | $ | (6,769,529.23) |
| | | | | |
| American Fund 2025 | 60.20% | 8.17% | $ | 62,219,695.33 |
| +/- Northern Trust | -12.24% | -1.42% | $ | (4,752,471.43) |

## 7.    Northern Trust Focus 2030 Fund:

70.    The Northern Trust Focus 2030 Fund's underperformance dates back to its inception.

**Table 5.a** below illustrates nearly four-years of underperformance leading up to the Class Period,

relative to benchmark indexes and Comparator Funds.

**Table 5.a**

2010-2013

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2030 | 49.77% | 10.86% |
| Vanguard 2030 | 60.26% | 12.80% |
| T Rowe Price 2030 | 68.14% | 14.19% |
| American Funds 2030 | 68.17% | 14.19% |
| S&P 2030 TD BM | 57.79% | 12.35% |
| DJ US 2030 TD BM | 69.33% | 14.39% |

71.    A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table**

**5.a** above as benchmarks for the performance of the Northern Trust Focus 2030 Fund.  Again, one

of Northern Trust's largest client retirement plans uses the S&P Target Date 2030 as the benchmark

index for the Northern Trust Focus 2030 Fund.  Morningstar also places the Northern Trust Focus

2030 Fund in its Target Date 2030 Morningstar Category along with the Comparator Funds

managed by American Funds, T. Rowe Price, and Vanguard.

22

72.     Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2030 Fund from the Plan.  Predictably, the underperformance continued throughout the Class Period.

73.     **Table 5.b** below illustrates the underperformance of the Northern Trust Focus 2030 Fund from January 1, 2015 through December 31, 2020 on an annualized basis.  Furthermore, the differences in annual performance are even more pronounced when compounded over time.  Thus, as the table demonstrates, the Northern Trust Focus 2030 Fund also significantly underperformed benchmark indexes and the Comparator Funds on a cumulative basis.

**Table 5.b**

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performace |
|------|------|------|------|------|------|------|------------------------|------------------------------|
| NT Focus 2030 | -2.09% | 7.31% | 15.67% | -5.73% | 19.40% | 13.24% | 54.91% | |
| Vanguard 2030 | -1.03% | 7.83% | 17.53% | -5.85% | 21.07% | 14.10% | 63.14% | -8.24% |
| T Rowe Price 2030 | -0.03% | 7.70% | 19.45% | -6.28% | 22.47% | 15.90% | 71.08% | -16.18% |
| American Funds 2030 | 0.47% | 7.71% | 18.43% | -4.16% | 20.05% | 16.16% | 71.29% | -16.39% |
| S&P 2030 TD BM | -0.31% | 8.32% | 16.19% | -5.99% | 20.37% | 18.40% | 68.11% | -13.21% |
| DJ US 2030 TD BM | -0.15% | 9.12% | 12.67% | -3.29% | 19.18% | 10.88% | 56.89% | -1.99% |

74.     Put in a broader context, according to Morningstar, the Northern Trust Focus 2030 Fund performed worse than 72% and 85% of funds in the Target Date 2030 Morningstar Category for the preceding three-year and five-year periods, respectively.  During those periods, there have been between 149 and 192 funds in the Target Date 2030 Morningstar Category.

75.     At the beginning of 2015, the assets of the Northern Trust Focus 2030 Fund totaled approximately $27.9 million.  **Table 5.c** below shows the hypothetical growth of $27.9 million invested in the Northern Trust Focus 2030 Fund and each of the Comparator Funds from January 1, 2015 through December 31, 2020.  As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2030 Fund with one of the Comparator Funds in 2015 resulted in the Plan losing upwards of $4.5 million in retirement savings.

**Table 5.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $27,910,199.00 |
|---|---|---|---|---|
| Northern Trust Focus 2030 Fund W | 54.91% | 7.57% | $ | 43,234,317.60 |
| | | | | |
| Vanguard Target Retirement 2030 | 63.14% | 8.50% | $ | 45,533,103.47 |
| +/- Northern Trust | -8.24% | -0.93% | $ | (2,298,785.87) |
| | | | | |
| T. Rowe Price Target 2030 | 71.08% | 9.36% | $ | 47,749,866.73 |
| +/- Northern Trust | -16.18% | -1.80% | $ | (4,515,549.13) |
| | | | | |
| American Fund 2030 | 71.29% | 9.38% | $ | 47,807,463.61 |
| +/- Northern Trust | -16.39% | -1.82% | $ | (4,573,146.01) |

**8.** **Northern Trust Focus 2035 Fund:**

76.     The Northern Trust Focus 2035 Fund's underperformance dates back to its inception.
**Table 6.a** below, illustrates nearly four-years of underperformance leading up to the Class Period,
relative to benchmark indexes and Comparator Funds.

**Table 6.a**

<u>2010-2013</u>

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2035 | 53.37% | 11.54% |
| Vanguard 2035 | 64.59% | 13.57% |
| T Rowe Price 2035 | 71.20% | 14.71% |
| American Funds 2035 | 68.54% | 14.26% |
| S&P 2035 TD BM | 61.14% | 12.95% |
| DJ US 2035 TD BM | 77.78% | 15.83% |

77.     A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table
6.a** above as benchmarks for the performance of the Northern Trust Focus 2035 Fund.  Again, one
of Northern Trust's largest client retirement plans uses the S&P Target Date 2035 as the
benchmark index for the Northern Trust Focus 2035 Fund.  Morningstar also places the Northern
Trust Focus 2035 Fund in its Target Date 2035 Morningstar Category along with the Comparator
Funds managed by American Funds, T. Rowe Price, and Vanguard.

24

78.     Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2035 Fund from the Plan.  Predictably, the underperformance continued throughout the Class Period.

79.     **Table 6.b** below illustrates the underperformance of the Northern Trust Focus 2035 Fund from January 1, 2015 through December 31, 2020 on an annualized basis.  Furthermore, the differences in annual performance are even more pronounced when compounded over time.  Thus, as the table demonstrates, the Northern Trust Focus 2035 Fund also significantly underperformed the benchmark indexes and Comparator Funds a cumulative basis.

### Table 6.b

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performace |
|---|---|---|---|---|---|---|---|---|
| NT Focus 2035 | -2.50% | 8.30% | 18.95% | -7.43% | 16.16% | 13.33% | 53.06% | |
| Vanguard 2035 | -1.26% | 8.27% | 19.13% | -6.59% | 22.43% | 14.80% | 67.21% | -14.15% |
| T Rowe Price 2035 | 0.14% | 7.65% | 20.89% | -6.87% | 23.72% | 17.05% | 75.76% | -22.69% |
| American Funds 2035 | 0.60% | 8.00% | 21.09% | -5.14% | 23.22% | 17.55% | 80.76% | -27.70% |
| S&P 2035 TD BM | -0.36% | 8.85% | 17.78% | -6.87% | 22.19% | 18.40% | 72.13% | -19.07% |
| DJ US 2035 TD BM | -0.44% | 10.36% | 14.71% | -4.31% | 22.02% | 12.15% | 65.05% | -11.98% |

80.     Put in a broader context, according to Morningstar, the Northern Trust Focus 2035 Fund performed worse than 59% and 82% of all funds in the Target Date 2035 Morningstar Category in the preceding three-year and five-year periods, respectively.  During those periods, there have been between 148 and 188 funds in the Target Date 2035 Morningstar Category.

81.     At the beginning of 2015, the assets of the Northern Trust Focus 2035 Fund totaled approximately $33 million.  **Table 6.c** below shows the hypothetical growth of $33 million invested in the Northern Trust Focus 2035 Fund and each of its Comparator Funds from January 1, 2015 through December 31, 2020.  As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2035 Fund with one of the Comparator Funds in 2015 resulted in the Plan losing over $9 million in retirement savings.

**Table 6.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $ 33,050,058.00 |
|---|---|---|---|---|
| Northern Trust Focus 2035 Fund W | 53.06% | 7.35% | $ | 50,587,300.01 |
| | | | | |
| Vanguard Target Retirement 2035 | 67.21% | 8.95% | $ | 55,262,858.83 |
| +/- Northern Trust | -14.15% | -1.59% | $ | (4,675,558.82) |
| | | | | |
| T. Rowe Price Target 2035 | 75.76% | 9.85% | $ | 58,087,536.70 |
| +/- Northern Trust | -22.69% | -2.50% | $ | (7,500,236.69) |
| | | | | |
| American Fund 2035 | 80.76% | 10.37% | $ | 59,741,210.34 |
| +/- Northern Trust | -27.70% | -3.02% | $ | (9,153,910.32) |

## 9.    Northern Trust Focus 2040 Fund:

82.     The Northern Trust Focus 2040 Fund's underperformance dates back to its inception. **Table 7.a**, below, illustrates nearly four years of underperformance leading up to the Class Period, relative to benchmark indexes and Comparator Funds.

**Table 7.a**

**2010-2013**

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2040 | 55.11% | 11.86% |
| Vanguard 2040 | 66.87% | 13.97% |
| T Rowe Price 2040 | 72.87% | 15.00% |
| American Funds 2040 | 69.40% | 14.41% |
| S&P 2040 TD BM | 63.58% | 13.39% |
| DJ US 2040 TD BM | 83.91% | 16.83% |

83.     A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table 7.a** above as benchmarks for the performance of the Northern Trust Focus 2040 Fund. Again, one of Northern Trust's largest client retirement plans uses the S&P Target Date 2040 as the benchmark index for the Northern Trust Focus 2040 Fund. Morningstar also places the Northern Trust Focus 2040 Fund in its Target Date 2040 Morningstar Category along with the Comparator Funds managed by American Funds, T. Rowe Price, and Vanguard.

84.     Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2040 Fund from the Plan.  Predictably, the underperformance continued throughout the Class Period.

85.     **Table 7.b** below illustrates the underperformance of the Northern Trust Focus 2040 Fund from January 1, 2015 through December 31, 2020 on an annualized basis.  Furthermore, the differences in annual performance are even more pronounced when compounded over time.  Thus, as the table demonstrates, the Northern Trust Focus 2040 Fund also significantly underperformed the benchmark indexes and Comparator Funds on a cumulative basis.

**Table 7.b**

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performance |
|---|---|---|---|---|---|---|---|---|
| NT Focus 2040 | -2.96% | 8.59% | 19.95% | -8.20% | 23.84% | 13.61% | 63.25% | |
| Vanguard 2040 | -1.60% | 8.72% | 20.70% | -7.34% | 23.85% | 15.44% | 71.08% | -7.83% |
| T Rowe Price 2040 | 0.16% | 7.65% | 22.02% | -7.33% | 24.71% | 18.11% | 79.56% | -16.31% |
| American Funds 2040 | 0.57% | 8.17% | 21.94% | -5.55% | 24.41% | 18.77% | 85.13% | -21.88% |
| S&P 2040 TD BM | -0.39% | 9.21% | 18.87% | -7.42% | 23.35% | 18.40% | 74.86% | -11.60% |
| DJ US 2040 TD BM | -0.69% | 11.36% | 16.46% | -5.24% | 24.57% | 13.28% | 72.22% | -8.97% |

86.     Put in a broader context, according to Morningstar, the Northern Trust Focus 2040 Fund performed worse than 55% and 85% of all funds in the Target Date 2040 Morningstar Category in the preceding three-year and five-year periods, respectively.  During those periods, there have been between 149 and 192 funds in the Target Date 2040 Morningstar Category.

87.     At the beginning of 2015, the assets of the Northern Trust Focus 2040 Fund totaled approximately $20.9 million.  **Table 7.c** below shows the hypothetical growth of $20.9 million invested in the Northern Trust Focus 2040 Fund and each of the Comparator Funds from January 1, 2015 through December 31, 2020.  As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2040 Fund with one of the Comparator Funds in 2015 resulted in the Plan losing upwards of $4.5 million in lost savings.

**Table 7.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $20,989,947.00 |
|---|---|---|---|---|
| Northern Trust Focus 2040 Fund W | 63.25% | 8.51% | $ | 34,266,709.25 |
| | | | | |
| Vanguard Target Retirement 2040 | 71.08% | 9.36% | $ | 35,909,297.09 |
| +/- Northern Trust | -7.83% | -0.85% | $ | (1,642,587.84) |
| | | | | |
| T. Rowe Price Target 2040 | 79.56% | 10.25% | $ | 37,689,704.46 |
| +/- Northern Trust | -16.31% | -1.74% | $ | (3,422,995.21) |
| | | | | |
| American Fund 2040 | 85.13% | 10.81% | $ | 38,859,364.74 |
| +/- Northern Trust | -21.88% | -2.30% | $ | (4,592,655.49) |

### 10.  Northern Trust Focus 2045 Fund:

88.     The Northern Trust Focus 2045 Fund's underperformance dates back to its inception.
Table 8.a, below, illustrates nearly four years of underperformance leading up to the Class Period,
relative to benchmark indexes and Comparator Funds.

**Table 8.a**

<u>2010-2013</u>

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2045 | 55.15% | 11.87% |
| Vanguard 2045 | 66.83% | 13.96% |
| T Rowe Price 2045 | 72.79% | 14.98% |
| American Funds 2045 | 69.28% | 14.38% |
| S&P 2045 TD BM | 65.39% | 13.71% |
| DJ US 2045 TD BM | 86.93% | 17.32% |

89.     A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table
8.a** above as benchmarks for the performance of the Northern Trust Focus 2045 Fund.  Again, one
of Northern Trust's largest client retirement plans uses the S&P Target Date 2045 as the
benchmark index for the Northern Trust Focus 2045 Fund.  Morningstar also places the Northern
Trust Focus 2045 Fund in its Target Date 2045 Morningstar Category along with the Comparator
Funds managed by American Funds, T. Rowe Price, and Vanguard.

28

90.    Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2045 Fund from the Plan.  Predictably, the underperformance continued throughout the Class Period.

91.    **Table 8.b** below illustrates the underperformance of the Northern Trust Focus 2045 Fund from January 1, 2015 through December 31, 2020 on an annualized basis.  Furthermore, the differences in annual performance are even more pronounced when compounded over time.  Thus, as the table demonstrates, the Northern Trust Focus 2045 Fund also significantly underperformed the benchmark indexes and Comparator Funds on a cumulative basis.

**Table 8.b**

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performace |
|---|---|---|---|---|---|---|---|---|
| NT Focus 2045 | -2.95% | 8.57% | 19.79% | -8.13% | 23.73% | 13.63% | 63.03% | |
| Vanguard 2045 | -1.58% | 8.88% | 21.45% | -7.89% | 24.92% | 16.17% | 73.97% | -10.94% |
| T Rowe Price 2045 | 0.16% | 7.70% | 22.40% | -7.57% | 25.39% | 18.65% | 81.57% | -18.53% |
| American Funds 2045 | 0.65% | 8.29% | 22.35% | -5.54% | 24.71% | 19.21% | 87.27% | -24.24% |
| S&P 2045 TD BM | -0.45% | 9.53% | 19.54% | -7.73% | 24.02% | 18.40% | 76.60% | -13.57% |
| DJ US 2045 TD BM | -0.86% | 12.05% | 17.68% | -5.98% | 26.49% | 14.18% | 77.52% | -14.49% |

92.    Put in a broader context, according to Morningstar, the Northern Trust Focus 2045 Fund performed worse than 78% and 95% of all funds in the Target Date 2045 Morningstar Category in the preceding three-year and five-year periods, respectively.  During those periods, there have been between 148 and 188 funds in the Target Date 2045 Morningstar Category.

93.    At the beginning of 2015, the assets of the Northern Trust Focus 2045 Trust Fund totaled approximately $15.5 million.  **Table 8.c** below shows the hypothetical growth of $15.5 million invested in the Northern Trust Focus 2045 Fund and each of the comparator funds from January 1, 2015 through December 31, 2020.  As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2045 Fund with one of the Comparator Funds in 2015 resulted in the Plan losing upwards of $3.7 million in retirement savings.

**Table 8.c**

c.

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $15,544,379.00 |
|---|---|---|---|---|
| Northern Trust Focus 2045 Fund W | 63.03% | 8.49% | $ | 25,342,009.83 |
| | | | | |
| Vanguard Target Retirement 2045 | 73.97% | 9.67% | $ | 27,042,492.57 |
| +/- Northern Trust | -10.94% | -1.18% | $ | (1,700,482.74) |
| | | | | |
| T. Rowe Price Target 2045 | 81.57% | 10.45% | $ | 28,223,157.69 |
| +/- Northern Trust | -18.53% | -1.96% | $ | (2,881,147.86) |
| | | | | |
| American Fund 2045 | 87.27% | 11.02% | $ | 29,109,851.51 |
| +/- Northern Trust | -24.24% | -2.54% | $ | (3,767,841.68) |

### 11. Northern Trust Focus 2050 Fund:

94. The Northern Trust Focus 2050 Fund's underperformance dates to its inception. **Table 9.a** below illustrates nearly four years of underperformance leading up to the Class Period, relative to benchmark indexes and Comparator Funds.

**Table 9.a**

2010-2013

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2050 | 55.22% | 11.88% |
| Vanguard 2050 | 66.85% | 13.96% |
| T Rowe Price 2050 | 72.84% | 14.99% |
| American Funds 2050 | 69.37% | 14.40% |
| S&P 2050 TD BM | Not Available | |
| DJ US 2050 TD BM | 87.21% | 17.36% |

95. A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table 9.a** above as benchmarks for the performance of the Northern Trust Focus 2050 Fund. Morningstar also places the Northern Trust Focus 2050 Fund in its Target Date 2050 Morningstar Category along with the Comparator Funds managed by American Funds, T. Rowe Price, and Vanguard.

96.     Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2050 Fund from the Plan. Predictably, the underperformance continued throughout the Class Period.

97.     **Table 9.b** below illustrates the underperformance of the Northern Trust Focus 2050 Trust from January 1, 2015 through December 31, 2020 on an annualized basis. Furthermore, the differences in annual performance are even more pronounced when compounded over time. Thus, as the table demonstrates, the Northern Trust Focus 2050 Trust also significantly underperformed the benchmark indexes and Comparator Funds on a cumulative basis.

**Table 9.b**

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performance |
|------|------|------|------|------|------|------|-----------------------|------------------------------|
| NT Focus 2050 | -2.96% | 8.55% | 19.61% | -8.03% | 23.57% | 13.52% | 62.55% | |
| Vanguard 2050 | -1.58% | 8.87% | 21.39% | -7.90% | 24.97% | 16.33% | 74.16% | -11.62% |
| T Rowe Price 2050 | 0.20% | 7.70% | 22.35% | -7.58% | 25.32% | 18.68% | 81.49% | -18.95% |
| American Funds 2050 | 0.66% | 8.33% | 22.58% | -5.62% | 24.97% | 19.42% | 88.27% | -25.72% |
| S&P 2050 TD BM | -0.46% | 9.74% | 20.20% | -7.95% | 24.33% | 18.40% | 77.91% | -15.36% |
| DJ US 2050 TD BM | -0.91% | 12.38% | 18.25% | -6.39% | 27.56% | 14.78% | 80.47% | -17.92% |

98.     Put in a broader context, according to Morningstar, the Northern Trust Focus 2050 Fund performed worse than 74% and 90% of all funds in the Target Date 2050 Morningstar Category in the preceding three-year and five-year periods, respectively. During those periods, there have been between 149 and 192 funds in the Target Date 2050 Morningstar Category.

99.     At the beginning of 2015, the assets of the Northern Trust Focus 2050 Fund totaled approximately $9.5 million. **Table 9.c** below shows the hypothetical growth of $9.5 million invested in the Northern Trust Focus 2050 Fund and each of the comparator funds from January 1, 2015 through December 31, 2020. As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2050 Fund with one of the Comparator Funds in 2015 resulted in the Plan losing upwards of $2.4 million in retirement savings.

**Table 9.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $ 9,577,445.00 |
|---|---|---|---|---|
| Northern Trust Focus 2050 Fund W | 62.55% | 8.43% | $ | 15,567,876.88 |
| | | | | |
| Vanguard Target Retirement 2050 | 74.16% | 9.69% | $ | 16,680,331.86 |
| +/- Northern Trust | -11.62% | -1.25% | $ | (1,112,454.98) |
| | | | | |
| T. Rowe Price Target 2050 | 81.49% | 10.44% | $ | 17,382,488.04 |
| +/- Northern Trust | -18.95% | -2.01% | $ | (1,814,611.16) |
| | | | | |
| American Fund 2050 | 88.27% | 11.12% | $ | 18,031,641.50 |
| +/- Northern Trust | -25.72% | -2.69% | $ | (2,463,764.62) |

## 12. Northern Trust Focus 2055 Fund:

100. The Northern Trust Focus 2055 Fund's underperformance dates back to its inception. **Table 10.a** below illustrates nearly four years of underperformance leading up to the Class Period, relative to a benchmark index and Comparator Funds.

### Table 10.a

### 2010-2013

| Fund | Cumulative | Annualized |
|---|---|---|
| NT Focus 2055 | 38.72% | 10.89% |
| Vanguard 2055 | 48.76% | 13.36% |
| T Rowe Price 2055 | 51.88% | 14.11% |
| American Funds 2055 | 50.24% | 13.72% |
| S&P 2055 TD BM | Not Available | |
| DJ US 2055 TD BM | 63.00% | 16.68% |

101. A prudent fiduciary would have used the indexes and Comparator Funds listed in **Table 10.a** (above) and **Table 10.b** (below) as benchmarks for the performance of the Northern Trust Focus 2050 Fund. Morningstar also places the Northern Trust Focus 2055 Fund in its Target Date 2055 Morningstar Category along with the Comparator Funds managed by American Funds, T. Rowe Price, and Vanguard.

102.     Despite four years of substantial underperformance, Defendants did not remove the Northern Trust Focus 2055 Fund from the Plan.  Predictably, the underperformance continued throughout the Class Period.

103.     **Table 10.b** below illustrates the underperformance of the Northern Trust Focus 2055 Fund from January 1, 2015 through December 31, 2020 on an annualized basis.  Furthermore, the differences in annual performance are even more pronounced when compounded over time.  As the table demonstrates, the Northern Trust Focus 2055 Fund also significantly underperformed the benchmark indexes and Comparator Funds on a cumulative basis.

### Table 10.b

| Fund | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Cumulative Compounded | Under(-)/Out (+) Performace |
|------|------|------|------|------|------|------|-----------|-------------|
| NT Focus 2055 | -2.92% | 8.53% | 19.42% | -7.97% | 23.43% | 13.56% | 62.31% | |
| Vanguard 2055 | -1.72% | 8.87% | 21.37% | -7.87% | 24.97% | 16.36% | 73.96% | -11.66% |
| T Rowe Price 2055 | 0.19% | 7.74% | 22.32% | -7.61% | 25.36% | 18.55% | 81.28% | -18.97% |
| American Funds 2055 | 0.65% | 8.28% | 22.63% | -5.65% | 25.02% | 19.39% | 88.21% | -25.91% |
| S&P 2055 TD BM | -0.52% | 9.94% | 20.48% | -7.98% | 24.51% | 18.40% | 78.76% | -16.46% |
| DJ US 2055 TD BM | -0.91% | 12.39% | 18.28% | -6.50% | 27.81% | 15.03% | 81.08% | -18.78% |

104.     Put in a broader context, according to Morningstar, the Northern Trust Focus 2055 Fund performed worse than 84% and 98% of funds in the Target Date 2055 Morningstar Category in the preceding three-year and five-year periods, respectively.  During those periods, there have been between 145 and 188 funds in the Target Date 2055 Morningstar Category.

105.     At the beginning of 2015, the assets of the Northern Trust Focus 2055 Fund totaled approximately $3.0 million.  **Table 10.c** below shows the hypothetical growth of $3.0 million invested in the Northern Trust Focus 2055 Fund and each of the Comparator Funds from January 1, 2015 through December 41, 2020.  As the table makes clear, Defendants' failure to replace the Northern Trust Focus 2055 Fund with one of the Comparator Funds in 2015 resulted in the Plan losing upwards of $785,000 in retirement savings.

**Table 10.c**

| Fund Name | Compounded Performance | Annualized Performance | Growth of | $ 3,031,281.00 |
|---|---|---|---|---|
| Northern Trust Focus 2055 Fund W | 62.31% | 8.41% | $ | 4,919,923.72 |
| | | | | |
| Vanguard Target Retirement 2055 | 73.96% | 9.67% | $ | 5,273,359.23 |
| +/- Northern Trust | -11.66% | -1.26% | $ | (353,435.50) |
| | | | | |
| T. Rowe Price Target 2055 | 81.28% | 10.42% | $ | 5,494,960.90 |
| +/- Northern Trust | -18.97% | -2.02% | $ | (575,037.18) |
| | | | | |
| American Fund 2055 | 88.21% | 11.12% | $ | 5,705,182.87 |
| +/- Northern Trust | -25.91% | -2.71% | $ | (785,259.14) |

106.    A best practice in selecting and monitoring a plan's investment options is when an investment option's net performance falls below the median of their peer group's one-, three-, and five-year cumulative returns to either place the fund on the watch list and/or remove and replace the investment option.  Here, however, Defendants remained idle and failed to remove the Funds from the Plan despite their abysmal underperformance for over a decade.[11]

107.    Defendants' selection and monitoring process for the Northern Trust Focus Funds has been deficient in other ways.  Significantly, Defendants failed to diversify by not choosing any non-proprietary target-date funds for the Plan.  As the DOL has indicated, "[n]onproprietary TDFs could also offer advantages by including component funds that are managed by fund managers other than the TDF provider itself, thus diversifying participants' exposure to one investment provider."[12]  Thus, even aside from failing to pay heed to the persistently poor performance of the

---

[11]    A number of other Plan funds, including the Company's proprietary funds (Northern Trust Large Cap Equity Index Fund, Northern Trust Mid Cap Equity Index, Northern Trust Small Cap Equity Index), also underperformed their stated benchmarks during the Class Period, all the while Defendants failed to monitor properly the Plan's investment line-up.

[12]    U.S. Dept. of Labor, "Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries" (Feb. 2013), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf.

Northern Trust Focus Funds and the availability of other superior target date funds, Defendants' failure to diversify further indicates that they failed to employ a proper fiduciary process.

108.    Defendants were also disloyal in selecting and maintaining the Northern Trust Focus Funds for the Plan.  The Plan's 2020 Form 5500, Schedule C, discloses that Northern Trust receives indirect compensation from the Plan in addition to the direct fees.  Because Northern Trust receives more money when more of its employees' assets are placed in these Funds, the Defendants' decision-making here was tainted by a conflict of interest.  Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendants caused unreasonable expenses to be charged to the Plan and participants in connection with their investment in the Northern Trust Focus Funds at the participants' expense.

109.    Given the facts alleged herein, it is implausible that had Defendants acted, individually and collectively, as prudent, diligent fiduciaries, they would have continued to maintain the Plan's investment in the Northern Trust Focus Funds under the prevailing circumstances, which included, *inter alia*, lack of a proper fiduciary process to oversee Plan investments, the persistently poor performance of the Funds, and the availability of better performing options at the same or lesser cost.  *See, e.g.*, *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-CV-10397-GAO, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) (denying motion to dismiss in similar case brought against John Hancock and stating that "[i]n total, ***the long-term retention of a substantial number of underperforming funds . . . gives rise to a plausible inference of an objectively imprudent monitoring process***.  That the retained underperforming funds were all proprietary John Hancock

funds . . . gives rise to the plausible inference of a subjective motive inconsistent with the plan participants' best interest" by the defendant ERISA plan fiduciaries) (emphasis added).[13]

110.    Likewise, it is not plausible that Defendants faithfully followed a suitable Investment Policy Statement ("IPS"), outlining the process of diversifying the Plan investments, so as to minimize the risk of large investment losses by the Plan and its participants.

111.    A fiduciary's failure to follow an appropriate IPS in investment selection and retention for a qualified 401(k) plan is of itself not a freestanding ERISA violation, but it is circumstantial evidence Defendants failed to use a viable policy with respect to the Plan's investments, and thus failed to conduct a prudent due diligence process as required by ERISA.  It is again not plausible that each and every one of the 11 Northern Trust Focus Funds in the Plan was chosen and retained pursuant to a rigorous evaluation, screening, and monitoring process involving, for instance, an appropriately detailed comparison to similar funds offered by competitor investment fund vendors to see how the Northern Trust Focus Funds compared to other vendors' funds with respect to costs, fees, performance history, and other relevant metrics.[14]  Rather, the proprietary TDF line-up from

---

[13]    *See also Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 912 (W.D. Mo. 2017) (denying motion to dismiss in similar ERISA case and observing that "[e]ven when the complaint does not allege facts showing specifically how the fiduciaries breached their duty through improper decision-making, a claim can survive a motion to dismiss if the court may reasonably infer from what was alleged that the fiduciaries followed a flawed process").

[14]    *See, e.g.*, C. Frederick Reish, *et al.*, *The Prudence Standard: Affiliated Products and Services* (June 2011), http://docplayer.net/12249737-The-prudence-standard-affiliated-products-and-services.html ("Thus, to meet the prudent process requirement, fiduciaries must thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained.  This means considering competing funds to determine which fund should be included in the plan's investment line-up.  As explained by the DOL in the preamble to the qualified default investment alternative regulations, '[a] fiduciary must engage in an objective, thorough, and analytical process that involves consideration of the quality *of competing providers and investment products*, as appropriate.'") (emphasis in original) (citation omitted).

a single fund family (Northern Trust) that the Plan featured throughout the Class Period is the result of self-dealing and imprudence by Defendants.

112.    Defendants' disloyal and imprudent decision to keep offering the Northern Trust Focus Funds in the Plan has had a substantial impact on Plan participants' retirement accounts. Based on an analysis of data compiled by Morningstar, Inc., Plaintiffs estimate the Plan lost tens of millions of dollars in retirement savings since 2015 because of Defendants' decision to retain the Northern Trust Focus Funds in the Plan. Based on the foregoing, a prudent fiduciary in like circumstances would have made a different decision in selecting the target date investment options for the Plan.

### B. Defendants Failed to Monitor Properly the Plan's Investment Management Fees

113.    Pursuant to ERISA, Defendants are required to "defra[y] reasonable expenses of administering the plan." *See* 29 U.S.C. §1103(c)(1). As the Restatement of Trusts notes, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts §90 cmt. b. Large retirement plans such as the Plan with billions of dollars in assets have substantial bargaining power to obtain share classes with lower costs than higher-cost shares, thereby avoiding having to pay unnecessary fees to the detriment of its participants.

114.    Here, a still further indication of Defendants' lack of a prudent fiduciary process, was Defendants' failure to monitor the Plan's investments to ensure that the Plan was invested in the least expensive available share class with regard to all of its investment options. Despite the fact that lower-cost shares of certain funds were available to the Plan during the Class Period, Defendants imprudently selected and retained the higher-cost shares of these funds. Because the only difference between the share classes is the amount of fees, selecting higher-cost shares has resulted in the Plan paying unreasonable fees.

115. By way of example, from 2019 through 2020, Defendants kept the Plan invested in the DFA Emerging Markets Core Equity Portfolio that charges 48 basis points ("bps") in investment management fees when the lower-cost shares (DFCEX) of this same fund were available for 39 bps. The Plan's higher-cost shares were nine bps higher, which resulted in participants paying 19% more in expenses than they should have for this component of their retirement plan investing. Defendants also provided the T Rowe Price Structured Research Equity to the Plan that charged 31 bps, when lower-cost shares were available for 30 bps. This caused participants to pay over 1% more in unreasonable expenses for the identical investment.

116. Moreover, Defendants imprudently maintained the Plan in other funds with excessive fees. These funds include, for example, DFA Emerging Markets Core Equity Portfolio (fee is 48 basis points or .48%); Jennison Small Cap Equity Fund (fee is 88 basis points or .88%); PIMCO All Asset Fund (fee is 1.01 basis points or 1.01%); and PIMCO International Bond Fund (fee is 56 basis points or .56%).

117. By comparison, the following comparable funds charge lower fees as detailed below:

| | | Morningstar Rank | Expense Ratio |
|---|---|---|---|
| **Northern Trust Plan investment option** | **DFA Emerging Markets Core Equity Portfolio** | **N/A** | **0.48%** |
| Comparable 1 | Vanguard Value Index Adm | 4-Stars | 0.05% |
| Comparable 2 | Fidelity Series Emerging Markets Opps | 4-Stars | 0.01% |
| Comparable 3 | American Century NT Emerging Markets G | 4-Stars | 0.01% |
| **Northern Trust Plan investment option** | **Jennison Small Cap Equity Fund** | **N/A** | **0.88%** |
| Comparable 1 | JP Morgan Small Cap Growth R6 | 5-Stars | 0.75% |
| Comparable 2 | Putnam Small Cap Growth R6 | 4-Stars | 0.84% |
| Comparable 3 | Lord Abbett Developing Growth R6 | 4-Stars | 0.59% |
| **Northern Trust Plan investment option** | **PIMCO All Asset Fund** | **N/A** | **1.01%** |

| Comparable 1 | AllianzGI Global Dynamic Allocation P | 4-Stars | 0.84% |
|---|---|---|---|
| Comparable 2 | Columbia Thermostat Inst | 5-Stars | 0.64% |
| Comparable 3 | Goldman Sachs Balanced Strategy R6 | 4-Stars | 0.71% |
| **Northern Trust Plan investment option** | **PIMCO International Bond Fund** | **N/A** | **0.56%** |
| Comparable 1 | American Funds Capital World Bond R6 | 4-Stars | 0.49% |
| Comparable 2 | DFA World ex US Government Fxd Inc I | 4-Stars | 0.20% |
| Comparable 3 | T Rowe Price Global Multi-Sector Bd I | 4-Stars | 0.50% |

118.    By providing Plan participants the more expensive Plan investment options, Defendants caused participants to lose millions in retirement savings.

### C.    Defendants Failed to Monitor Properly the Plan's Administrative Fees

119.    Defendants have also breached their duty to monitor the Plan's administrative costs, including the recordkeeping expenses, and to ensure that these costs were reasonable and prudent, and not the result of disloyal decision-making.  Among other things, on information and belief, Defendants failed to conduct an appropriately competitive bidding process during the Class Period, thereby keeping the Plan's administrative fees well above those charged to comparable plans, in order to, *inter alia*, profit from the direct or indirect fees paid by the participants to the Company, as well as from a host of undisclosed redemption fees, sales commissions, and other similar expenses in connection with transactions associated with the Plan's investment options.

120.    "Recordkeeping" is a catchall term for the suite of administrative services typically provided to a 401(k) plan, such as the Plan.  The recordkeeping market is highly competitive, with many vendors equally capable of providing recordkeeping services to 401(k) plans.  According to PlanSponsor's 2019 Recordkeeping Survey, 401(k) recordkeepers hold $4.9 trillion of Americans' retirement savings on their platforms.

121.    As such, 401(k) plans can customize the package of administrative services they obtain and have the services priced accordingly, in the best interests of a particular plan and its participants.  According to a study conducted by the Department of Labor, 401(k) plans featuring a large number of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. [15]  Relatedly, as plan asset size increases, the costs per participant should decrease.[16]  Recordkeeping fees for jumbo plans, such as the Plan, have also declined significantly in recent years, as a result of, *inter alia*, advances in technology, strong market competition, and increased attention to fees by fiduciaries of other 401(k) plans, such that the fees that may have been reasonable at one time, may have become excessive based on prevailing circumstances.

122.    Accordingly, prudent and unconflicted fiduciaries should put in place and conduct an appropriate process to continuously monitor and control a 401(k) plan's administrative costs.  As part of that process, fiduciaries should continuously pay close attention to the administrative fees being paid by the plan.  Among other things, a prudent fiduciary can track the service provider's expenses by seeking documents that summarize and contextualize that provider's compensation, such as the plan's fee transparency reports, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

123.    Additionally, in order to make an informed determination as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, prudent fiduciaries should identify and track all fees, including any direct compensation and

---

[15]    *Study of 401k Plan Fees and Expenses*, at 4.2.2 (Apr. 13, 1998) (https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf).

[16]    *See id*. ("[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").

revenue sharing being paid to the plan's service providers. Prudent fiduciaries should further monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources (including, as here, asset-based revenue sharing from the brokerage window) does not exceed reasonable levels.

124. Furthermore, in order to fulfill their fiduciary duty to monitor continually administrative expenses to ensure their reasonableness, a plan's fiduciaries should remain informed about the overall trends in the marketplace regarding the fees being paid by other plans, as well as the available rates for administrative services. This aspect of their fiduciary responsibilities will generally entail conducting a Request for Proposal ("RFP") at reasonable intervals, or immediately at any given point in time if the plan's administrative expenses appear high in relation to the general marketplace.[17]

125. Defendants breached their duty to monitor and control the Plan's administrative costs with prudence and loyalty by failing to undertake any of the aforementioned measures and acting to further the Company's own interests as opposed to those of the Plan. Here, among other things, there is no indication that Defendants conducted a proper bidding process or engaged in appropriate negotiations to lower the administrative costs during the Relevant Period. Additionally, Defendants failed to ensure that the fees paid to the service providers, including through the revenue-sharing arrangements, did not exceed reasonable levels, or unduly profit the Company or other parties in interest. Likewise, Defendants failed to monitor the appropriateness of the redemption fees, sales commissions, and other similar expenses in connection with transactions associated with the Plan's investment options. As such, the total amount of

---

[17]     *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (noting opinion of independent consultant in similar case "without an actual fee quote comparison' – *i.e.*, a bid from another service provider – [consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'").

administrative fees paid in connection with the Plan throughout the Class Period was unreasonable and imprudent, and contrary to the Plan's best interests.

126.    Here, as alleged above, the Plan had over 12,000 participants at the end of the 2020 Plan year, with total assets valued at approximately $2.752 billion as of December 31, 2020.  As such, the Plan is endowed with a significant bargaining power, given the numerosity of its participants, as well as its substantial assets.  Yet, Defendants failed to conduct a proper competitive bidding process concerning the Plan's recordkeeping arrangement despite their ability to negotiate reasonable and low-cost administrative fees for the Plan, including the recordkeeping fees.

127.    According to the Participant Disclosure Notice, dated July 12, 2021 ("2021 Participant Disclosure Notice"), Fidelity Investments® ("Fidelity") has served as the Plan's recordkeeper during the Class Period.  At all relevant times, the Plan's administrative fees and expenses have been paid primarily through a combination of direct charges to participant accounts and asset-based fees paid from the Plan's investments.  In light of all direct and indirect sources of revenue, Defendants failed to negotiate a reasonable amount with Fidelity for recordkeeping services.

128.    Here, based on the direct payments paid by Plan participants and the annual revenue share (or asset-based recordkeeping fees) paid by the Plan's investments, the Plan paid $2 million annually on average from 2015 to present.  During this period, the Plan had approximately 12,000 participants with account balances, resulting in substantial unreasonable recordkeeping fees each year.

129.    In light of the foregoing facts, it is evident that Defendants failed to conduct a competitive bidding process for the Plan's recordkeeping services.  Their actions are contrary to industry practices and the recommendations of the Department of Labor.  A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the

Plan. That is particularly so because recordkeeping fees for enormous plans such as the Plan have been declining since 2014. By failing to engage in a competitive bidding process for Plan recordkeeping fees, Defendants caused the Plan to pay unreasonable recordkeeping fees for the services rendered.

130. Furthermore, Defendants violated their fiduciary duties to Plan participants by imprudently selecting and then failing to remove non-proprietary funds that charge excessive fees that pay for the Plan's recordkeeping services. These fees, in turn, benefited Northern Trust (through, among other things, indirect revenue payments), and therefore, Northern Trust's selection of and maintenance of these funds were both breaches of the duty of loyalty (by not focusing exclusively on the Plan participants and beneficiaries' well-being) and prohibited transactions with parties in interest.

131. The Plan's 2020 Form 5500, Schedule C, discloses that Northern Trust receives indirect compensation from the Plan. This creates an incentive for Northern Trust to push up the assets being devoted to the Plan so that Northern Trust can earn more money, rather than because it is truly in the best interests of Plan participants. The Plan has over $2 billion in assets, for which Northern Trust was paid approximately $2 million in annual recordkeeping fees. This amounts to approximately $160 per participant on an annual basis during the Class Period. Given the large size of the Plan, such fees are excessive and unreasonable. Moreover, the recordkeeping fee is being paid out of the Plan's investments rather than a flat dollar amount per participant. This is in contrast to the prevailing industry practice, where a large fund should charge a smaller flat fee per participant charge that is not based on the assets under management.

132. Due to the Plan's strong bargaining power, and the availability of comparable or superior administrative service options in the marketplace at a lower cost, there was no reason for the Plan

to pay such a high administrative fee, thereby significantly reducing the participants' retirement savings.

133. By way of example, according to Fidelity itself, a standard recordkeeping fee for a plan with the same asset and participant size should be around $14-$21 per participant. Specifically, in another action challenging Fidelity's recordkeeping fees, Fidelity stipulated that if it were a third party, the value of its recordkeeping services for a plan of over $1 billion in assets, such as the Plan here, would range from $14-$21 per person per year.[18] By way of further example, according to the *401k Averages Book*, [19] the average recordkeeping/administrative fee through direct compensation, based on data compiled in 2019, was $5 per participant for plans with just 2,000 participants and $200 million in assets (a fraction of the number of Participants and assets held by the Plan). *See id.*, Pension Data Source, Inc. at 107, Chart 24.5 (Range of Per Participant Costs (20th ed. 2020) (data updated through September 30, 2019)).

134. There is no indication that the Plan receives any administrative services, including recordkeeping services, beyond those that are typically provided by Fidelity and other 401(k) service providers to comparable retirement plans.[20] Likewise, there is no indication that the value of the administrative services provided to the Plan is any different than the value of such services provided to any other plan of comparable size. Here, the administrative fees, including the

---

[18]     *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 214 (D. Mass. 2020).

[19]     According to 401ksource.com, *401k Averages Book*, published since 1995, is the oldest, most recognized source for non-biased, comparative 401(k) average cost information. It is designed to provide financial services professionals and plan sponsors with essential comparative cost information needed to determine if their plan costs are above or below average.

[20]     According to the 2021 Participant Disclosure Notice, the Plan incurs expenses for "recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan."

44

recordkeeping fees paid by the Plan during the Class Period, have been unreasonable and unwarranted, as they are well above the standard rates for large plans such as the Plan.

135.     Specifically, the Plan's direct recordkeeping costs were well above the $5 average for plans a fraction of the size of the Plan.  Additionally, on top of direct compensation, Participants have incurred further administrative costs in the form of revenue sharing throughout the Relevant Period.  The exact amount of that indirect compensation for recordkeeping services cannot be ascertained based on publicly available information, given that revenue sharing is divided among all the Plan's service providers which "could include but are not limited to recordkeepers, advisors and platform providers."  *401(k) Averages Book* at 7.  Moreover, according to the Plan's 2021 Participant Disclosure Notice, throughout the Class Period, the Plan's investments have been subject to unspecified redemption fees, commissions, and similar expenses in connection with transactions associated with the Plan's investment options.

136.     In light of, *inter alia*, Fidelity's own acknowledgment that the recordkeeping services should have been available to a plan of such size as the Plan for a significantly lower cost, Participants would have paid much less in recordkeeping and other administrative fees during the Relevant Period were it not for the Defendants' lack of monitoring.  Given the size of the Plan's assets during the Relevant Period and the number of its Participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained comparable or superior recordkeeping services (from Fidelity itself or from another provider) at a much lower cost.  Specifically, Defendants' failure to continually monitor and negotiate the Plan's administrative costs, including the recordkeeping fees, has cost Participants over $2 million in fees out of their retirement accounts.  A prudent fiduciary would have leveraged the size of this jumbo plan to negotiate lower administrative fees for their participants annually.

## PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND RELATED FACTS UNTIL SHORTLY BEFORE FILING THIS COMPLAINT

137.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment option selections of fiduciaries of similar plans, the costs of the Plan's investments compared to those of similarly sized plans, the availability of superior investment options, or the costs of the Plan's investment management services compared to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed via the investigation of their counsel.  Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments; and Defendants' processes for selecting and monitoring the Plan's service providers), because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

138.    ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), authorizes any participant or beneficiary of a retirement plan to bring an action individually on behalf of that plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).  Such claims are brought "in a representative capacity on behalf of the plan as a whole." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985).

139.    The claims set forth in this action meet the requirements of Rule 23, and class certification would be appropriate with respect to the following class (the "Class"):

All participants and beneficiaries of the Plan from June 1, 2015 through the present, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's investment or administrative function.

140.    The Class includes tens of thousands of members and is so large that joinder of all its members is impracticable.

141.    There are numerous questions of law and fact common to the Class because the claims asserted herein arise out of a singular course of common conduct by Defendants that affected all Class members through their participation in the Plan in precisely the same way, in violation of precisely the same legal duties.  Common questions of law and fact include the following, without limitation:

•       whether Defendants employed an imprudent process in selecting and monitoring the Plan's investments;

•       whether Defendants caused the Plan to invest its assets in imprudent funds to the exclusion of other available alternatives;

•       whether Defendants breached their fiduciary duties to the Plan;

•       whether Defendants engaged in prohibited transactions in violation of ERISA;

•       whether the Plan sustained losses resulting from their breaches of fiduciary duty, and if so, the amount of those losses; and

•       what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of fiduciary duties and prohibited transactions.

142.    There are no substantial individual questions among Class members on the merits of this action.

143.    Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

144.    Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class Period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

145.    Certification of the claims asserted herein would be appropriate under Rule 23(b)(1)(A) or (B).    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a).   In addition, an adjudication of the claims asserted herein by any Plan participant would, as a practical matter, be dispositive of the interests of all other Plan participants.   As this Court has recognized several times, "[b]ecause of ERISA's distinctive 'representative capacity' and remedial provisions, ERISA litigation of this nature presents a paradigmatic example of a [Rule 23](b)(1) class."  *Neil v. Zell*, 275 F.R.D. 256, 267 (N.D. Ill. 2011).

146.    Alternatively, this action should be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).   A class action is the superior method for the fair and efficient adjudication of this controversy because common questions of law and fact predominate over questions affecting only individual class members, and because, in light of the representative nature of the claims at issue, a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

147.    Plaintiffs' counsel, Peiffer Wolf Carr Kane & Conway, LLP, Law Offices of Michael M. Mulder, and Scott+Scott Attorneys at Law LLP will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g).

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty of Prudence
### (Violation of ERISA, 29 U.S.C. §1104)
### (Against All Defendants)

148.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

149.    As alleged above, the Defendants were fiduciaries of the Plan.

150.    ERISA §404, 29 U.S.C. §1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the plan and its participants for the purpose of providing benefits.

151.    Defendants' fiduciary duties include administering the Plan with the care, skill, diligence, and prudence required by ERISA.  As such, Defendants must evaluate and monitor the Plan's investments on an ongoing basis, eliminate imprudent investments, and take all necessary steps to ensure the Plan's assets are invested prudently.

152.    As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 575 U.S. at 523.

153.    Defendants breached their fiduciary duties by failing to establish and follow a prudent process for investigating, evaluating, and monitoring investments.  Their fiduciary failures resulted in a plan loaded with deficient funds that were not suitable for the Plan due to, *inter alia*, persistently poor performance and/or unreasonable fees.

49

154.    By failing to adequately consider less risky and better-performing investment products for the Plan, Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

155.    As a direct and proximate result of Defendants' breaches of fiduciary duty, the Plan and each of its participants who invested in the Funds have suffered tens of millions of dollars of damages and lost-opportunity costs which continue to accrue.

156.    Defendants' actions, and failures to act, violated the duties of prudence contained in ERISA §404(a).

157.    ERISA §502(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA §409.

158.    Under ERISA §409(a), 29 U.S.C. §1109(a), a fiduciary that violates any of ERISA's duties, including ERISA §404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

159.    Thus, under ERISA §§502(a)(2) and 409(a), 29 U.S.C. §§1132(a)(2) and 1109(a), Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA §404(a), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

160.    Under ERISA §502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and surcharge.

## COUNT II
### Failure to Monitor
### (Against All Defendants)

161.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

162.    Defendants had a duty to monitor the performance of each individual to whom they delegated any fiduciary responsibilities.

163.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

164.    To the extent any of the Defendants' fiduciary responsibilities were delegated to another fiduciary, the Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

165.    Defendants breached their fiduciary monitoring duties by, among other things:

    a.      failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b.      failing to monitor their appointees' fiduciary process; and

    c.      failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan to the detriment of Plan participants' retirement savings.

166.    Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

a.      failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.      failing to monitor its appointees' fiduciary process;

c.      failing to implement a process to ensure that the appointees monitored the performance of Plan investments; and

d.      failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan, all to the detriment of Plan participants' retirement savings.

167.    As a direct result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Defendants and the other delegating fiduciaries prudently discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

**COUNT III**
**Breach of Co-Fiduciary Duty**
**(Violation of ERISA §405(a)(1)-(3), 29 U.S.C. §1105(a)(1)-(3))**
**(Against All Defendants)**

168.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

169.    A fiduciary with respect to a plan is liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omissions of such other fiduciary, knowing such act or omission is a breach," ERISA §405(a)(1), or if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA §405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."  ERISA §405(a)(3).

170.     Pursuant to §405 of ERISA, 29 U.S.C. §1105, Defendants are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches of fiduciary duty; knowingly undertook to conceal those breaches; enabled their co-fiduciaries to commit the breaches and failed to make any reasonable efforts to remedy the breaches.

171.     ERISA §502(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA §409.

172.     Under ERISA §409(a), a fiduciary that violates any of ERISA's duties, including ERISA §405(a)(1), (a)(2) and (a)(3), must "make good" to the Plan the losses to the Plan resulting from its violations of ERISA §405(a)(1), (a)(2) and (a)(3), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

173.     Thus, Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA §405(a)(1), (a)(2) and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

174.     Under ERISA §502(a)(3), Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and surcharge.

### COUNT IV
### Prohibited Transactions with a Party in Interest
### (Violation of ERISA §406(a)(1), 29 U.S.C. §1106(a)(1))
### (Against All Defendants)

175.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

176.     As the Plan sponsor, the Plan Trustee, and a service provider for the Plan, Northern Trust (including its subsidiaries) is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).

177.    As the Plan recordkeeper, Fidelity (including its subsidiaries) is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).

178.    Under ERISA §406(a)(1)(C), 29 U.S.C. §1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and a party in interest.

179.    Under ERISA §406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

180.    Here, in violation of §406(a)(1)(C)-(D), 29 U.S.C. §1106(a)(1)(C)-(D), Defendant-fiduciaries caused the Plan to offer and to continue offering the Plan options challenged herein that not only generated unreasonable fees that profited Northern Trust, a party of interest *vis-à-vis* the Plan, but also enabled Northern Trust to bolster its investment management business, in furtherance of Northern Trust's corporate strategy and business opportunities, thereby further profiting Northern Trust, as opposed to advancing the interests of the Plan.  In further violation of these statutory prohibitions, Defendants caused the Plan to pay unreasonable fees to the Plan's recordkeeper, Fidelity, also a party in interest.  By selecting and retaining the funds challenged herein, Defendants further caused the Plan to engage in transactions with parties in interest that were for more than reasonable compensation, were subject to redemption fees and sales commissions, and/or were on terms less favorable than those offered to other plans' participants. Defendants caused the Plan to engage in these prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and parties in interest, and that such transactions constitute

a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

181.    As alleged herein, during the Class Period, Northern Trust and/or its subsidiaries have served as the investment manager(s) or other service provider(s) for the Plan.  During the Class Period, Fidelity and/or its subsidiaries have served as the Plan's recordkeeper.  At all relevant times, Northern Trust and/or its subsidiaries as well as Fidelity and/or its subsidiaries, have collected unreasonable compensation in the form of various direct or indirect fees from the Plan. In particular, Northern Trust and/or its subsidiaries, as well as Fidelity and/or its subsidiaries, have deducted on a regular basis unreasonable fees from the Plan assets in return for the investment management services, or other services provided to the Plan, including but not limited to the administrative services.   In addition, throughout the Class Period, the Plan was subject to redemption fees, commissions, and other similar expenses associated with its investment options, including the Company's proprietary funds.  Defendants caused the Plan to engage in these prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and parties in interest, and that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

182.    As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid millions of dollars in unreasonable investment management fees, and other unreasonable fees and expenses, thereby resulting in millions of dollars in losses to the Plan and its Participants, and/or unjust profits for the benefit of the parties in interest.

183.    Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the

unjust profits obtained in violation of 29 U.S.C. §1106(a)(1), and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

**COUNT V**
**Prohibited Transactions with Fiduciaries**
**(Violation of ERISA §406(b), 29 U.S.C. §1106(b))**
**(Against All Defendants)**

184.　Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

185.　As alleged herein, Northern Trust is the Plan Trustee and a fiduciary of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

186.　As alleged herein, the Defendant Benefit Committee and its respective members are fiduciaries of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

187.　Under ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), a fiduciary shall not deal with the assets of the plan in its own interest or for its own account.

188.　Under ERISA §406(b)(2), 29 U.S.C. §1106(b)(2), a fiduciary shall not in its individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants and beneficiaries.

189.　Under ERISA §406(b)(3), 29 U.S.C. §1106(b)(3), a fiduciary shall not receive any consideration for his personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

190.　Throughout the Class Period, Northern Trust dealt with the assets of the Plan in its own interest when it not only caused the Plan to pay unreasonable direct or indirect fees to the Company or its subsidiaries, but also profited from the development of its investment management business

due to the Plan's investment in Northern Trust proprietary funds or funds from which it received indirect revenue, including through revenue sharing, in violation of 29 U.S.C. §1106(b)(1).

191.    Throughout the Relevant Period, the Benefit Committee Defendants dealt with the assets of the Plan in their own interest when they caused the Plan to pay unreasonable direct or indirect fees to the Company or its subsidiaries and used the Plan to develop the Company's investment management business due to the Plan's investment in Northern Trust proprietary funds or funds from which it received indirect revenue, including through revenue sharing, in violation of 29 U.S.C. §1106(b)(1).  Upon information and belief, every member of the Benefit Committee was a Northern Trust executive, whose compensation and promotion levels increased when they acted to increase revenue for the Company and to bring about further business opportunities for the Company.

192.    Throughout the Relevant Period, Defendants named in this Count, acting on behalf of the Company, whose corporate interests were adverse to those of the Plan and its participants, in transactions involving the Plan, violated 29 U.S.C. §1106(b)(2), by causing the Plan to offer and maintain investment funds that not only generated unreasonable revenue for the Company or its subsidiaries, but also enabled the Company to develop and sustain its investment management business in furtherance of its business ventures and opportunities to the detriment of the Plan and its participants.

193.    Throughout the Class Period, Northern Trust received and collected consideration for its own account in connection with the transactions involving the assets of the Plan in violation of 29 U.S.C. §1106(b)(3).  These transactions took place on a periodic basis throughout the Class Period when unreasonable fees were received and collected in return for the investment management services, or other services provided to the Plan, including but not limited to the administrative

services provided to the Plan. Additionally, these transactions took place during the Class Period, via the redemption fees, commissions, and other similar expenses associated with the Plan's investment options, including the Company's proprietary funds.

194. Based on the foregoing facts, Defendants, each a fiduciary of the Plan, violated 29 U.S.C. §1106(b). These prohibited transactions took place on an ongoing basis throughout the Class Period when Northern Trust or its subsidiaries repeatedly received and collected unreasonable fees from the Plan, all the while also reaping unjust profits from the development of Northern Trust's investment management business due to the inclusion of the challenged funds in the Plan.

195. As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid unreasonable fees and expenses, in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants, and/or unjust profits to the Plan fiduciaries.

196. Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the unjust profits obtained in violation of 29 U.S.C. §1106(b), and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, pray for judgment as follows:

A. Declare that Defendants breached their fiduciary duties to the Plan;

B. Declare that Defendants engaged in prohibited transactions with parties in interest;

C. Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.      Order that Defendants make good to the Plan the losses resulting from their breaches of fiduciary duty;

E.      Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty or prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.      Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the Plan to the position they would have been but for the breaches of fiduciary duty; and any other kind of relief and/or damages available pursuant to ERISA §§409 and 502(a)(2) and (3);

G.      Reform the Plan to include only prudent investments;

H.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA §502(g), 29 U.S.C. §1132(g), and/or for the benefit obtained for the Plan;

I.      Order Defendants to pay interest to the extent it is allowed by law; and

J.      Award such other and further relief as the Court deems equitable and just.

Dated:  October 22, 2021

_____/s/ Michael M. Mulder_____
Michael M. Mulder (Bar No. 1984268)
Elena N. Liveris (Bar No. 6297048)
THE LAW OFFICES OF MICHAEL M.
MULDER
1603 Orrington, Suite 600
Evanston, IL 60201
Telephone: (312) 263-0272
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Garrett W. Wotkyns (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
8068 East Del Acero Drive
Scottsdale, AZ 85258
Telephone: (480) 889-3514
gwotkyns@scott-scott.com

Tanya Korkhov
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
tkorkhov@scott-scott.com

Joseph C. Peiffer (*pro hac vice*)
Daniel J. Carr (*pro hac vice*)
Kevin P. Conway (*pro hac vice*)
Jamie L. Falgout (*pro hac vice* forthcoming)
PEIFFER WOLF CARR KANE & CONWAY LLP
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: (504) 523-2434
jpeiffer@peifferwolf.com
dcarr@peifferwolf.com
kconway@peifferwolf.com
jfalgout@peifferwolf.om

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system on October 22, 2021, and that all parties are represented by counsel of record registered with the CM/ECF system.


_/s/ Michael M. Mulder_